**UNITED STATE DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**CASE NO.: 8:19-cv-02289-VMC**

| | |
|---|---|
| **MEREDEITH METZLER, DIANA BELICH, BLEAN TAYE and STEVEN BRUNO**, Individually and on behalf of all others similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>**MEDICAL MANAGEMENT INTERNATIONAL, INC., A CARING DOCTOR (MINNESOTA), P.A., A CARING DOCTOR (TEXAS), P.C., A CARING DOCTOR (NEW JERSEY), P.C., XYZ CORPORATIONS 1-45**, all collectively d/b/a **BANFIELD PET HOSPITAL**, )<br><br>Defendants. ) | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION AND AUTHORIZE NOTICE TO POTENTIAL COLLECTIVE MEMBERS [DE #54]** |

## PRELIMINARY STATEMENT

Plaintiffs' bar for certification may be "low," but it is not "non-existent" and they have not met it. Plaintiffs are former *managers* who were responsible for *managing* animal hospitals. Plaintiffs were "working managers" and regardless of the tasks they performed along-side the associates they managed, they were the highest level of non-physician management in the hospital, *at all times*. Banfield calls these managers "Practice Managers" because they are *managing* a practice and *always* responsible for the operations and profitability of the hospital. Banfield needs Practice Managers ("PMs") to interact with customers, resolve concerns and observe and evaluate associates to be successful. They are the front lines charged with managing, interviewing, hiring, training, disciplining and coaching associates. They manage the hospital's budget, ensure the hospital is supplied, and perform management duties, every day, all day.

Plaintiffs are surprisingly quiet about their management duties. They do not deny performing management duties but only lament that they spent some percentage of time *also* performing tasks similar those performed by the associates they managed. FLSA's regulations specifically recognize that managers, in many industries including healthcare, spend time engaging with employees and customers and working with the people they manage while concurrently maintaining their management duties. *There is no factual dispute that Plaintiffs, and all PMs, perform management duties and never lose that hat*. Plaintiffs complain about Banfield's desire for PMs to be out with Banfield's customers, pets, and associates to improve and monitor customer service, operational efficiencies, associate performance and profitability. Plaintiffs' disagreement with Banfield's management strategy may be a good reason for them to find alternative employment but it is *not* evidence of an FLSA violation or "similarly situated" associates.

Plaintiffs' Motion to Conditionally Certify an FLSA Collective ("Motion") should be denied. First, the Motion does not identify a procedure or policy that violates the law. Plaintiffs' evidence of an alleged unlawful policy or practice is (1) PMs were classified as exempt; (2) had the same job description (identifying management duties), and (3) received similar training. This cannot be sufficient to establish an FLSA violation and authorize notice. Many managers are exempt, have the same job description, and receive similar training. Those facts are not dispositive of an illegal practice or to authorize court-approved notice.

Although not required, Defendants produced overwhelming evidence why this case cannot be litigated as a collective action. The individualized inquiries required to evaluate the management duties of PMs and the factors that influence those duties, including hospital size, profitability, number of doctors, turnover, associate experience, skill set and other individualized factors, predominate such that this case cannot be decided on representative testimony. Each Practice Manager spends his/her day differently. The amount and complexity of decisions they make, the time spent on solely management duties, the level of discretion allowed and the consequences of their decisions will vary depending on these and other factors. A Judge in the Middle District of Florida recently held in a similar case that:

> "[P]laintiff-specific inquiries would be required as to whether or not an individual was misclassified, and therefore exempt from the FLSA. Specifically, individualized inquiries would be required as to whether various 'Office Managers' meet the FLSA 'executive exemption.' These individualized inquires also make conditional certification in this proceeding unwarranted."

*Kelley v. Taxprep1, Inc.*, 2014 U.S. Dist. LEXIS 184589, at *5 (M.D. Fla. Apr. 2, 2014).

Plaintiffs do not deny they were managers but complain that during some portion of the day, they are performing non-exempt tasks. They may have performed a host of tasks but the individual inquiry into each hospital and each PM's employment will demonstrate that regardless

of the specific task they were conducting, the PM is always the manager on duty.  PMs are always *concurrently performing management duties*. The PM always has management duties including hiring, firing, budgeting, evaluating, training, scheduling, resolving conflict and customer service.  PMs are critical *to the operations of the hospital*.  To evaluate whether a PM's management duties were their "primary duties" the Court must individually examine and inquire into each hospital, the unique qualities and circumstances there and each PM in a focused, forensic and individualized manner. Plaintiff simply cannot identify "similarly situated" employees.

Plaintiffs' identical, boilerplate, conclusory assertions in their declarations are insufficient to satisfy their evidentiary burden to prove Plaintiffs are "similarly situated" to anyone.  Plaintiffs offer their inadmissible *opinions* that the "non-exempt tasks" they performed were the "most important" part of their job and not the management tasks Banfield compensated them to perform. However sincere their opinions, they are inconsistent with 44 declarations of PMs and Field Directors ("FD") filed with this opposition, from 20 states, PM training materials, job description, performance evaluations and metrics, and the work of PMs.[1] The most important job of a PM is to *manage* a hospital. Plaintiffs' opinions about the importance to Banfield of their other tasks, does not establish that others are "similarly situated." If it did, the Court would need to authorize notice to those PMs holding the same *opinion* as Plaintiffs about the importance of their

---

[1] *See* Declarations attached in alphabetical order as follows:  Ahmed, Megan Mack (Ex. 1); Breen, Ryan (Ex. 2); Brochin, Jamie (Ex. 3); Chall, Justin (Ex. 4); Cobb, Jesse ( Ex. 5); Cooper, Benjamin (Ex. 6); Cordon, Wendy (Ex. 7); Creasman, Philip (Ex. 8); Crowe, Elizabeth (Ex. 9); Davis, Jen (Ex. 10); Derrenberger, Nicole (Ex. 11); Duffy, Sarah (Ex. 12); Duran-Lovett, Diane (Ex. 13); Eddington, Jeff (Ex. 14); Fagins, Niesha (Ex. 15); Feigner, Kathleen (Ex. 16); Ferretti, Angela (Ex. 17); Foss, Lisa (Ex. 18); Gachassin-Owens, Susan (Ex. 19); Hall, Dawn (Ex. 20); Hayes, Tabi'tha (Ex. 21); Headrick, Tara Nicole Robson  (Ex. 22); Huddleston, Tara (Ex. 23); Hutchinson, Christie (Ex. 24); Landendorff, DarlyAnn (Ex. 25); Lontoc, Rossana (Ex. 26); Mackey, Robert (Ex. 27); Michael, Caitlyn (Ex. 28); Montoya, Teresa (Ex. 29); Norman, Mychael (Ex. 30); O'Neill, Lauren (Ex. 31);  Paiz, Ruby Mae (Ex. 32); Pierce, Erin (Ex. 33); Poffenroth, Jodie (Ex. 34); Pollack, Heather (Ex. 35); Powers, Janal (Ex. 36); Punales, Soni (Ex. 37); Richardson, Kayonna (Ex. 38); Shaw, Kristie (Ex. 39); Shipp, Crystal (Ex. 40); Stecher, Aleksandra (Ex. 41); Stephens, Rebecca (Ex. 42); Stinnett, Chris (Ex. 43); Triplat, Angela (Ex. 44); Vogt, Kira (Ex. 45); Wollenzien, Kayla (Ex. 46). Declarations are cited to by last name and paragraph reference ("Ahmed ¶__").

non-exempt tasks, an obviously flawed and absurd result. Plaintiffs' opinions about what is "more important" to Banfield's business is not evidence of a violation and not relevant.

This case should not be certified. Plaintiffs do not assert an FLSA violation common to all PMs. Every hospital presents individual facts that would predominate over common factual issues. Every PM performs concurrent duties. The kinds of management decisions will differ from each hospital. These are all highly individualized issues incompatible with litigation as a collective. At least 44 PMs and FDs do not believe that "non-exempt tasks" were the "most important" tasks they performed. Banfield cannot defend this case as collective and respectfully asks the Court to deny Plaintiffs' motion.

## STATEMENT OF RELEVANT FACTS

### I. PMs Are Responsible For The Daily Operations Of Their Hospitals

The PM "is one of the Company's most mission critical roles.[2]" Each Banfield hospital is managed by one PM, the highest level of non-medical management at each hospital.[3] PMs are the leaders of the hospital and responsible for running it, overseeing the day-to-day operations; managing the budget, monitoring revenue for profitability; creating and managing associate schedules; hiring and training new associates; and supervising, coaching, counseling, disciplining and terminating associates.[4] The primary purpose and function of the PM is to manage the hospital and ensure the highest quality of veterinary care, exceptional client service, associate engagement and maximum productivity of the veterinary medical team.[5] *See* PM Job Description attached as Ex. 1 at A. Every PM manages and directly supervises at least two full time associates, varying

---

[2] Shaw ¶10.
[3] Brochin ¶7; Mackey ¶7; Michael ¶7; Stinnett ¶2; Poffenroth ¶2.
[4] Breen ¶¶8-18; Chall ¶¶7-20; Cobb ¶¶ 4-14; Stinnett ¶¶ 6-13.
[5] Breen ¶9; Vogt ¶9; Wollenzien ¶9.

from approximately six to more than twenty.[6]  The positions managed by the PM include Client

Service Coordinators ("CSC"), Veterinary Technicians ("VT"), Veterinary Assistants ("VA"), and

Shift Leads (collectively, "associates"). *Id.*

PMs report to Field Directors, who work remotely and oversee approximately 15-20

hospitals.[7]  FDs must ensure that their region delivers on operations, financial performance, and

staffing, and do so by developing PMs to manage and operate effective, efficient and productive

hospital teams.[8]  *See* FD Job Description attached as Ex. 1 at B.  FDs have little, if any involvement

in the daily operations of the hospitals in their regions.[9]  FDs do not regularly work in hospitals,

and only visit based on the specific needs of the market and the hospital.[10]  PMs independently

manage their designated hospital.[11]

PMs are "people managers" responsible for hiring, training, supervising, coaching,

developing, disciplining, demoting, promoting, and terminating associates. PMs post job openings,

interview candidates, oversee the hiring process and recommend wages.[12]  PMs manage the labor

costs of their hospital.[13]  PMs have discretion to create associate schedules and identify growth

opportunities.[14] PMs must train associates and outline job expectations.[15]

PMs enforce Banfield policies and ensure their hospital is providing quality medical care.[16]

When issues arise, PMs must correct, coach, and develop the skills of associates.[17] PMs discipline

---

[6] Chall, Davis, Duffy, Ferretti, Wollenzien, Duran-Lovett, Fagins, Hall, Hutchinson, Montoya, Vogt ¶10.
[7] Davis ¶7; Fagins ¶7; Foss ¶2.
[8] Cobb ¶¶ 5, 8; Stinnett ¶5; Foss ¶4; Poffenroth ¶4.
[9] Cobb ¶¶ 5, 8, 17; Stinnett ¶14; Foss ¶ 10; Duffy ¶7; Paiz ¶7.
[10] Michael ¶7; Norman ¶7; O'Neill ¶7; Paiz ¶7; Pollack ¶7; Poffenroth ¶3.
[11] Crowe ¶20; Ferretti Decl ¶20; Poffenroth ¶¶10, 12; Gachassin-Owens ¶¶14-15.
[12] Brochin ¶10; Davis ¶12; Huddleston ¶12; Cobb ¶8; Stinnett ¶8.
[13] Chall ¶18; Duran-Lovett ¶11; Poffenroth ¶9.
[14] Feigner ¶11; Hall ¶¶9, 11; Cobb ¶12; Poffenroth ¶8.
[15] Breen ¶15; Brochin ¶9; Stinnett ¶10.
[16] Davis ¶17; Brochin ¶18; Shaw ¶19; Eddington ¶17.
[17] Breen ¶12; Brochin ¶28; Duran-Lovett ¶13; Huddleston ¶22.

associates who fail to meet Banfield's policies and procedures and give verbal and written counseling and terminate associates.[18]  PMs track associate performance and conduct one-on-one performance reviews.[19]  PMs can recommend demotions, promotions, and raises for associates, all of which are afforded great weight by their FDs.[20]

PMs maintain operations-related management duties. One of the PMs' *primary* responsibilities is to achieve the hospital's financial objectives and increase profitability. (Ex. 1 at A).  FDs oversee between 15-20 hospitals and work offsite.  The main purposes of the PM is to manage the hospital's daily operations.[21]  Banfield needs an engaged PM onsite.  PMs are responsible for knowing the budget, monitoring labor costs, inventory costs, and productivity.[22] There is no manual proscribing how PMs meet their obligations. PMs must rely on their independent judgment and discretion to interpret and plan around the hospital's budget.[23]  Each PM must decide how to achieve these goals given the unique needs of their hospital.[24]

PMs are responsible for the overall quality of care at their hospital. (Ex. 1 at A).  PMs ensure that doctors and associates are supported and productive.[25] PMs identify, order, and maintain necessary medical equipment and medicine for the hospital.[26]  PMs respond to any facility-related operations issues to ensure the hospital is open during hospital hours.[27]

---

[18] Creasman Decl ¶15; Fagins ¶13; Lontoc ¶12; Paiz ¶13; Stinnett ¶9.
[19] Creasman ¶¶17-18; Mackey ¶¶14-15; Duran-Lovett ¶15.
[20] Poffenroth ¶10; Cobb ¶8; Hall ¶¶14-15.
[21] Hutchinson ¶9; Pollack ¶20; Shaw ¶7; Cobb ¶¶13-17; Foss ¶¶4-5.
[22] Feigner ¶20; Michael ¶14; Montoya ¶11; Robson Headrick ¶18.
[23] Duran-Lovett ¶23; Duffy ¶22; Foss ¶¶9-10.
[24] Punales ¶7.
[25] Breen ¶8; Brochin ¶19; Hall ¶9; Norman ¶9.
[26] Hayes ¶11; Derrenberger ¶16; Mackey ¶20; Brochin ¶26.
[27] Cooper ¶11; Richardson ¶11.

PMs must manage overall customer satisfaction. (Ex. 1 at A).  PMs must ensure customer satisfaction in *every* interaction and respond to and resolve complaints.[28] As the only manager, PMs are in the best position to address customer-related complaints. PMs need not confer with an FD to resolve customer complaints. *Id.*  PMs make individualized assessments and rely on their own independent judgment and discretion to fashion a resolution and maintain customer satisfaction.[29] Banfield's reputation and success depend on a competent PM to manage customer issues.

The PM is an indispensable manager of people and the business of a hospital and appropriately classified them as exempt from overtime pursuant to the executive and administrative exemptions. *See* 29 C.F.R. § 541.100.  PMs were compensated above a rate of $455 per week;[30] and their *primary* duty was management. They customarily and regularly directed two or more full-time employees, had the authority to hire and fire and relied on their discretion and independent judgment about significant matters related to Banfield's business.

## II.   <u>Practice Managers *Are Always Managers*, Regardless of the Tasks They Perform</u>

PMs are working managers who spend differing amounts of time working with those they manage. Banfield encourages PMs to roll up their sleeves, meet with customers, observe associates, evaluate efficiencies and meet the business goals of the hospital. PMs who work with customers and associates can monitor productivity and efficiency, support and coach associates and ensure quality and excellent customer relations.  In order to be engaged, PMs perform associate-type tasks in furtherance of and concurrently with their management duties but that varies depending on the

---

[28] Feigner ¶¶18-19; Ferretti ¶¶19-20; Hall ¶19; Cobb ¶¶14-15.
[29] Paiz ¶¶11, 19; Triplat ¶¶19-20; Pollack ¶19; Stephens ¶19.
[30] Pleiss ¶4; Schaeffer ¶4; Powers ¶5.

needs of each hospital.[31]  PMs must never neglect their managerial duties.  This would be inconsistent with Banfield's expectations for its PMs.[32]

Regardless of the tasks PMs are performing, they are *always managing the people and the business of the hospital*.[33]  A PM *never* steps out of the management role.  *Id.*  PMs are always the highest-level manager over associates and must act as a manager to address all issues in the hospital.  *Id.*

### III.  The Day-to-Day Duties/Tasks Performed by PMs and Time Spent On Each Requires an Individualized Assessment of each PM and Each Hospital

No two Banfield hospitals are alike.  There is no "uniform" guide to manage a hospital. Many factors dictate and influence how a PM will spend their time each day including, but not limited to, hospital size, FD preference and management style, associate skill set, hospital revenue, location and staffing.[34]  The only commonality to every PM is that they are all the highest level of non-medical management and make all management decisions at their hospital. Each PM has the authority and discretion to apply his or her tools and techniques to manage their staff and the hospital to accomplish their management goals.

The differences from hospital to hospital dictate the management duties needed.  For example, many hospitals are inside PetSmart retail stores, while others are standalone. (Gachassin-Owens ¶22).  Some hospitals are small, and others are well over 3,500 square feet. (*Id.* at ¶21). PMs managing hospitals in a PetSmart may have different factors driving the business. (Michael ¶17).  PMs in a PetSmart must, for example, build up and maintain relationships with PetSmart

---

[31] Brochin ¶31; Crowe ¶¶22-23; Feigner ¶22; Hall ¶22; Montoya ¶11.
[32] Stinnett ¶17 ("I never directed Practice Managers to work in any particular role besides management."); Foss ¶8 ("If a Practice Manager is not actively managing the hospital and its associates, he or she is not meeting Banfield's expectations for the job."); Shaw ¶23 ("The purpose of my position as Practice Manager was not to be working in a paraprofessional role.").
[33] Huddleston ¶22; Lontoc ¶20; Montoya ¶22; Norman ¶21
[34] Crowe ¶23; Feigner ¶23; Hall ¶23; Headrick ¶23.

management. (Gachassin-Owens ¶23; Derrenberger ¶22). PMs in PetSmarts can rely on PetSmart's supplies for retail but PMs in standalone hospitals must order and oversee their own retail items. (Gachassin-Owens ¶24). Likewise, hospital size is a significant factor impacting the job duties of a PM.[35] The size of a hospital is often determined by the number of doctors on staff.[36] Staff levels are mixed amongst Banfield hospitals. Some PMs manage fifteen or more full-time associates,[37] and others manage fewer than ten.[38] The larger the hospital, the more hiring, training, scheduling, and supervising associates. In smaller hospitals, PMs must be more strategic about staffing and profitability.[39] While, "at the larger hospitals (4-5 doctors), the Practice Managers are so busy that it would be virtually impossible for them to perform the job duties of another associate." (Cobb ¶19).

Another factor in a PM's experience is the kinds of associates at their hospital. Some hospitals have a PM and a Chief of Staff while others have shift leads.[40] A hospital's budget and revenue expectations vary by hospital and influence how PMs perform their duties. A PM may devote less time to managing inventory in a small hospital versus a large hospital.[41] A PM managing a high performing hospital requires more oversight of the budget. *Id.* Based on many variables, the work experiences of each PMs is different. The Court cannot look at one or two and decide all PMs spend their time the same.

## IV.   Banfield's Declarations Reflect the Individualized Nature of the Inquiry and that All PMs are Managers All the Time, Regardless of the Tasks they Perform.

---

[35] Cobb ¶18; Stinnett ¶2; Foss ¶2; Poffenroth ¶2.
[36] Cobb ¶3; Stinnett ¶3; Foss ¶3; Poffenroth ¶3.
[37] Chall ¶10; Davis ¶10; Duffy ¶10; Ferretti ¶10; Wollenzien ¶10.
[38] Duran-Lovett ¶10; Fagins ¶10; Hall ¶10; Hutchinson ¶10; Montoya ¶10; Vogt ¶10.
[39] Poffenroth ¶11.
[40] Feigner ¶12; Ladendorff ¶12; Pollack ¶12; Vogt ¶12; Stinnett ¶4, Creasman ¶11; Feigner ¶22; Stecher ¶10
[41] Punales ¶¶7-8; Poffenroth ¶11

Declarations of current and former PMs and FDs demonstrate that PMs are always the manager on duty in their hospitals. (Feigner ¶21) ("I am always the leader in the hospital.")). "Practice Managers are always ultimately responsible for the management of the hospital such as scheduling, leadership, and the day to day operations." (Stinnett ¶4). "As management is the most important part of Practice Managers' job, those duties always come first.  For example, if a Practice Manager is helping watch the desk and a management duty pops up, the Practice Manager will have someone else watch the desk while he/she tends to the management issues - Any time the Practice Manager was at the hospital, they were the manager." (Stinnett ¶17). "[I]f the Practice Manager is at the front desk, answering the phone, they would be simultaneously be coaching their front desk associate on the job duties and/or working on scheduling." (Cobb ¶20)

PMs never take off their manager hat and are always responsible for the associates and hospital operations. The time spent working with their associates may "vary from day-to-day depending on a number of factors including who is working that day, what comes up, and any number of other things." (Hall ¶23).  Regardless, no matter what "the task Practice Managers are performing, they were always responsible for the management of the hospital. They were still responsible for meeting all of their management deadlines." (Punales ¶12).

PMs acknowledge that when they perform tasks similar to their associates, they are "always reviewing performance of the associates, ensuring compliance with the schedule, monitoring patient/customer feedback on performance, as well as providing on-going training on policy and procedures for associates." (Headrick ¶17). When working with associates, PMs are "always responsible for resolving concerns or complaints for customers, resolving the associate issues,

increasing the profitability and smooth operation of the hospital, managing the worksite and ensuring that the hospital is complying with policies and is profitable."[42]

> FD's expect PMs to be working managers. One attested:

> I expect my Practice Managers to keep their manager hat on no matter what job they're performing. Regardless, the focus of a Practice Manager should always be their leadership and business operation duties. For example, if a managerial issue pops up while the Practice Manager is performing paraprofessional duties, they are responsible for handling that managerial issue immediately. (Foss ¶¶7-8).

The PM role "is fluid and dynamic." "[E]ach hospital has different clients and associates." (Cobb ¶15). "The job duties of Practice Managers vary significantly based on the size of the hospital. A hospital that has one doctor is very different than a hospital that has two doctors." (Cobb ¶16). "[L]arger volume hospitals tend to have more 'doctor days' which means that more paraprofessional staff must be at the hospital to support those doctors." (Cordon ¶4).

> [T]he larger the hospital, the higher the expected volume of sales. Practice Managers had to use their discretion to regulate these expectations within their respective hospital. This also influenced the way Practice Managers managed their budgets. For the busier hospitals, the expectation was that they could work on a tighter labor budget, and slower hospitals ran higher labor budgets. It was up to my Practice Managers to balance this. (Punales ¶¶7-8).

"[E]ach hospital's budget is different depending on the size of the hospital. It is up to the PM to "manage the budget based on their specific hospital's size and needs. The seniority of the hospital also determines how the Practice Manager manages its marketing and public relations. The more established a hospital, the less marketing that is needed to maintain customers and establish new ones." Pierce ¶5. "Moreover, the PMs were only given "guard rails" (Punales ¶9) and "an expectation and understanding of the result and the basic leadership role they must fill." (Cordon

---

[42] Crowe, Feigner, Huddleston ¶22; Hall ¶24; Headrick ¶22; Lontoc ¶20; Montoya ¶22; Norman ¶21; Paiz ¶18.

¶16). PMs were given discretion to run their hospital as they saw fit, which was highly individualized as there was no "right" way to run a hospital.[43]

## V.    **Plaintiffs' Boilerplate Declarations Offer No Evidence of Management Duties**

Plaintiffs' declarations offer no helpful evidence. First, none of the Plaintiffs deny performing management duties. They only allege they had no authority to make management decisions *during training*.[44] Their declarations ignore their Job Description and make no mention of their managerial/operational duties. Plaintiffs all say they spent some percent of time performing similar tasks to associates but do not comment on their concurrent management duties or what they do the rest of the time. They are silent about how they interview, hire, train, schedule, supervise, coach, mentor, develop, discipline, retain, evaluate, or fire associates. Plaintiffs are silent about how they meet financial objectives; drive revenue growth; monitor cost containment, loss prevention, and labor costs; manage the quality of care; ensure doctors and associates are supported and productive; identify, order, and maintain medical equipment to provide the highest level of veterinary care services; or ensure compliance with Banfield's policies and procedures and local, state, and federal laws. [DE #54, 5-18]. Plaintiffs just ignore the level of discretion and independent judgment given to PMs to make management decisions.

Second, the nearly identical declarations contain inadmissible hearsay, speculation and unsupported opinions about how *other PMs* spend their time. [DE #54, 5-18]. Some Plaintiffs opine about the number of hours *other PMs* would have worked (Worked 45-50 hours a week (Bruno, Metzler ¶7) or that "all PMs performed the same or similar primary duties" (Pleiss, Ripple, Taye ¶12). Plaintiffs state, without personal knowledge, that other PMs spent their time in their

---

[43] Crowe ¶23; Hall ¶25; Norman ¶22.
[44] Belich, Hughes, Plaskey ¶8 ("had no authority to make any decisions at all during the time I was in training.").

jobs as described by Plaintiffs and that other PMs would come forward with claims.  (Lowe, Edwards-Nelson, Pleiss ¶6) (Spent majority of "time doing the same manual labor and customer service tasks that the hourly paid employees performed.. . .customer service, answering phones, scheduling and verifying pet appointments, checking patients in and out of the hospital, cleaning examination rooms between patients, making product sales, and selling pet insurance."); (Belich, Lowe, Metzler, Vatovac, Edwards-Nelson ¶14, Mooney ¶17 "if PMs like myself were made aware of our right to receive overtime pay . . . other PMs would likely come forward with claims for overtime compensation due.").

Plaintiffs' declarations demonstrate that an individualized inquiry is required for each PM at each hospital.  Plaintiff's opinion that *some* PMs spend a large percentage of time performing tasks similar to their hourly associates is not enough.

## LEGAL ARGUMENT

### I.   Legal Standard

#### A.   *Conditional Certification Should Only be Granted in Appropriate Cases.*

To bring a collective action on behalf of others, consistent with judicial economy, Plaintiffs must overcome procedural hurdles designed to ensure that a collective action is only implemented "**in appropriate cases**." *See Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 169-70 (1989).  "Where a collective action would not serve the interests of judicial economy, plaintiffs should not be permitted to request court-supervised notice as a tool for drumming-up business." *Robinson v. Dolgencorp*, 2006 U.S. Dist. LEXIS 85471, at *25 (M.D. Fla. Nov. 13, 2006). The "decision to conditionally certify a collective FLSA action is within the discretion of the district court." *Lee v. Sky Plumbing*, 2010 U.S. Dist. LEXIS 26286, at * 2 (M.D. Fla. Mar. 1, 2010).  The Middle District of Florida follows the two-step process described by the Eleventh Circuit in *Hipp v. Liberty Nat'l*

*Life Ins.*, 252 F.3d 1208, 1219 (11th Cir. 2001). *Brooks v. A Rainaldi Plumbing*, 2006 U.S. Dist. LEXIS 89417, at *4 (M.D. Fla. 2006). Plaintiffs must demonstrate that: (1) there are sufficient employees who wish to opt-in to the action; and (2) Plaintiffs are similarly situated with the putative collective with respect to jobs and pay. *Lemming v. Security Forces*, 2010 U.S. Dist. LEXIS 133233, at *3 (M.D. Fla. 2010). Claims requiring individualized inquiries weigh against certification even at the first stage of analysis. *Gomez v. United Forming*, 2009 U.S. Dist. LEXIS 101804, at *2 (M.D. Fla. 2009).

**B.     *Plaintiffs' Burden to Establish "Similarly Situated" is Not Meaningless.***

Plaintiffs always bear the burden to demonstrate that the collective is similarly situated. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096-97 (11th Cir. 1996). While Plaintiffs' "burden at the notice stage is not heavy, it is not 'invisible.'" *Hart v. JPMorgan Chase Bank, N.A.*, 2012 U.S. Dist. LEXIS 175983, at *11 (M.D. Fla. 2012). "A plaintiff has the burden of showing a reasonable basis for his claim that there are other similarly situated employees." *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1260 (11th Cir. 2008). To satisfy this burden, Plaintiffs "must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of duties and pay provisions." *Lewis-Gursky v. Citigroup, Inc.*, 2017 U.S. Dist. LEXIS 31135, at *8-9.

The standard at this stage tasks Plaintiffs with providing declarations "probative of the similarly situated question." *Rumreich v. Good Shepherd Day Sch. of Charlotte, Inc.*, 2018 U.S. Dist. LEXIS 219649, at *25 (M.D. Fla. 2018). Such declarations must "successfully engage defendants' affidavits to the contrary." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996). Alhtough some courts grant conditional certification more frequently, "federal courts across the Middle and Southern Districts of Florida have routinely denied requests for conditional certification where, as here, the plaintiffs attempt to certify a broad class based only [on] the conclusory allegations of a

few employees." *Wooton v. Steelmaster Indus.*, 2019 U.S. Dist. LEXIS 97026, at *9 (M.D. Fla. June

10, 2019) (citing *Kelley v. Taxprep1, Inc.*, 2014 U.S. Dist. LEXIS 184589, at *5 n.2 (M.D. Fla. Apr.

2, 2014) (collecting cases)).   Declarations do not suffice when they fail to go to the heart of key

issues in a case. *See e.g., Demauro v. Limo, Inc.*, 2011 U.S. Dist. LEXIS 1229 (M.D. Fla. Jan. 3, 2011).

## II.   **Plaintiffs Cannot Establish, Even Under a Lenient Standard, that the Putative Class Members Are Similarly Situated.**

Plaintiffs argue they are similarly situated to all Banfield PMs because PMs (1) perform

common job duties; (2) are compensated as exempt; (3) are hired from the same PM job posting;

and (4) receive uniform training. [DE # 54, p. 6-8].  Those factors may be true but do not establish

a violation of law. Plaintiffs have not submitted any evidence that similarly situated employees

suffered from a policy or practice *that violates the FLSA*.

### A.   *The Highly Individualized Nature of the PMs Role Makes a Collective Action Entirely Inappropriate.*

Plaintiffs claim that "variations in duties will not preclude a finding that employees are

similarly situated where there is a uniform collective of employees performing the same primary

function" and that the Court should not consider such evidence until the second stage. [DE #54,

pp.11-12]. Plaintiffs' argument is flawed.  First, "class certification issues cannot be decided in a

vacuum." *West v. Verizon Communs., Inc.*, 2009 U.S. Dist. LEXIS 82668, at *11 (M.D. Fla. 2009).

"It is entirely appropriate for the Court to be cognizant of the factual and legal issues presented

by the case when determining whether this case can be appropriately treated as a collective action."

*Id.*  In *Poggi v. Humana at Home 1, Inc.*, 2017 U.S. Dist. LEXIS 179252, at *19-22 (M.D. Fla. 2017),

the court specifically rejected the same argument put forth by the Plaintiffs.  In denying conditional

certification because "individualized issues predominate[d]," the court articulated that "the

individualized nature of the claims will not change once discovery has been completed" where defendant's declarations addressed that employees had different daily job duties that varied. *Id.*

More importantly, whether PMs maintain the primary duty of management, regardless of the concurrent non-exempt tasks they perform is at the heart of the exemption and cannot be ignored. No two hospitals are the same. Many factors influence how a PM spends their day. Plaintiffs' declarations strain to paint a picture that all hospitals are indistinguishable, and any PM could be placed in any hospital and have an identical experience. A PM may be *qualified* to work in other hospitals but the challenges they will face, and the manner they spend their time will be unique to that hospital determined by the PM's discretion. The differences in each hospital, outlined in Banfield's declarations, highlight by Plaintiffs' argument is unpersuasive. The size of a hospital, physical location, staff skill level, net revenue, inclusion of Chief of Staff or Shift Leads, number of associates, FD preferences, and more, create unique situations. All PMs do not spend their days the same as other PMs. Their only unifying common factor is that every PM manages two or more full time employees, hires and fires associates and manages all aspects of the operation of the hospital they are charged with managing.

There is no "battle of the declarations" here. Plaintiffs only testify about the tasks they view as non-exempt but are *silent* management tasks they perform *while engaging in non-exempt tasks* and the percentage of time they are not working on non-exempt tasks. To determine if the Plaintiffs are properly exempt, the Court must look at each PM, how they performed their job, the exempt work they performed, the importance of the exempt work to Banfield, the time spent doing *solely* non-management duties, how they handled management duties concurrently with their non-exempt tasks or whether they were just "answering phones, scheduling and verifying pet appointments, checking patients in and out of the hospital, cleaning examination rooms between

patients, making product sales, and selling pet insurance[45]," in violation of Banfield's expectations, as Plaintiffs allege. [DE # 54, p. 7].

Banfield has expectations of the duties performed by each PM and does not pay PMs a salary as high as $96,343.52 to answer phones.[46] That business model makes no sense and is inconsistent with the evidence. The Court will need to explore for example, whether PMs maintained concurrent management duties while allegedly answering phones. We must ask, were PMs evaluating associates while they assisted to clean a room. When checking patients in and out of the hospital, were they also responsible for ensuring that the hospital delivered a high-quality customer experience? When making product sales, were they also responsible for managing the inventory of products or driving profitability? When selling wellness plans, were they also responsible for managing the hospital's budget? Plaintiffs' entire argument rests on their claim that although they performed management duties, they were misclassified because in *their opinion* their non-management tasks were more important or "primary." The granular factual descriptions of the day-to-day duties of each PM, with all the variations that are determined by both obvious and nuanced differences between the hospitals and the FDs who manage them, preclude collective treatment of this class. How a PM spends their day and the nature and importance of management duties performed each day, are too individualized to establish anyone as "similarly situated." Based on the extensive level of individualized inquiry this case would require, Plaintiffs have not satisfied their burden to show that they are similarly situated with the putative collective.[47]

---

[45] This is a good example of the lack of credibility of Plaintiffs' declarations. Banfield does not "sell" insurance and has never sold insurance. Banfield offers wellness packages. (Poffenroth ¶5; Derrenberger ¶22; Paiz ¶11). All Plaintiffs know better and this obvious error is further reflective of the boilerplate nature of the declarations.

[46] This was the high range of the salary during the relevant period. (Powers ¶5).

[47] *Calvo v. Summit Broadband Inc.*, 2018 U.S. Dist. LEXIS 131381 (M.D. Fla. 2018) (denying certification "because plaintiff-specific inquiries would likely be required as to whether an individual was exempt from the FLSA."); *Wooton*, 2019 U.S. Dist. LEXIS 97026, at *12 (denying conditional certification where plaintiff failed to demonstrate that the

Plaintiffs urge the Court to disregard the application of any FLSA exemptions. This is precisely the information that courts have considered on a motion for conditional certification, going directly to the crux of this case. In *Kelley*, plaintiffs moved to conditionally certify a collective of tax service Office Managers on the basis that they had been misclassified. 2014 U.S. Dist. LEXIS 184589. In evaluating the exemption, the court noted:

> [P]laintiff-specific inquiries would be required as to whether or not an individual was misclassified, and therefore exempt from the FLSA. Specifically, individualized inquiries would be required as to whether various "Office Managers" meet the FLSA "executive exemption." These individualized inquires also make conditional certification in this proceeding unwarranted.

*Id.*, at *5-7. The court denied conditional certification. *Id.* In *Lovett v. SJAC Fulton Ind I, LLC*, 2015 U.S. Dist. LEXIS 80947, at *41-42 (N.D. Ga. June 23, 2015), the court weighed the employer's evidence going to the question of whether restaurant assistant managers were properly classified as exempt. Comparing against the plaintiff's own general statements about the non-managerial duties she performed, the court noted that "[t]he evidence submitted by Defendants to the contrary significantly discredits Plaintiff's claim that she is similarly situated to other Assistant Managers." *Id.* at *41-42.

Unlike Plaintiffs' declarations, Banfield's declarations provide specific information PMs were properly classified as exempt under the FLSA. The determination of whether each PM was properly classified as exempt under the executive or administrative exemptions requires an individualized analysis of each PM's primary duty, the level of discretion and independent judgment they had with respect to matters of significance, the number of associates they

---

employees were "similarly situated" with respect to job requirements and with regard to their pay provisions); *Udo v. Lincare, Inc.*, 2014 U.S. Dist. LEXIS 152166, at *33 (M.D. Fla. 2014) (denying conditional certification because "the differences between the employees defeat the prospect of achieving judicial economy by resort to a collective action.").

supervised, their requisite hiring and firing authority, their primary duty to train and whether time spent performing non-exempt tasks was done concurrently with their management responsibilities. Such an individualized undertaking would not "satisfy the rationale of a collective action, which is to preserve judicial economy." *Rosales v. El Michoacana LLC*, 2016 U.S. Dist. LEXIS 167686, at *11 (M.D. Fla. 2016).

### B. *Plaintiffs Fail to Identify an Unlawful Corporate Policy or Practice.*

Plaintiffs concede they perform management duties but complain about the time spent also performing non-exempt tasks. They also do not dispute that while they are performing these tasks, they are also, concurrently, the highest level of non-medical manager in the hospital. Putting aside Banfield's dispute with Plaintiffs' estimates of time spent doing non-exempt tasks, neither the FLSA, nor the regulations proscribe an amount of time that a management employee must be performing *solely* exempt duties to be classified as an exempt manager. The FLSA does not require that at an employee spend more than 50 percent of their time performing *only* exempt duties. 29 C.F.R. § 541.700(b). the FLSA regulations specifically contemplate a case-by-case determination:

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a).

The amount of time spent on non-exempt may be instructive, it is not dispositive. This magnifies the individualized nature of each PMs' particular situation. As long as the other requirements under the exemption test are met, working managers who perform exempt and non-exempt tasks concurrently can properly maintain their exemption. 29 C.F.R. §§ 541.106(a). Even spending a

vast majority of time performing non-exempt work does not destroy the exempt status.[48]

Regardless of the percent of time spent on non-exempt duties, employees whose primary duty is

management are properly classified as exempt executives.[49]

The case law overwhelmingly recognizes that the inherent nature of a working manager

*requires* that they work side by side with their staff.  Yet, they never step out of their role as the

manager.  For example, in *Diaz v. Team Oney, Inc.*, 291 F. App'x 947 (11th Cir. 2008) (unpublished),

the Eleventh Circuit agreed with the district court's finding that the assistant manager of two pizza

restaurants was properly classified as an exempt working manager even though he frequently

performed non-managerial tasks such as making pizzas, routing pizza deliveries, greeting

customers and cleaning the store, because as the highest ranking employee on duty during the

majority of his shifts, his managerial duties were significantly more important to the operation of

the restaurant than non-managerial tasks.[50]

Likewise, in *Calvo v. B&R Supermarkets, Inc.*, 63 F. Supp. 3d 1369 (S.D. Fla. 2014), the

court found that the primary duty of a grocery store assistant manager was management even

---

[48] *Darosa v. Fla. Default Law Group, P.L.*, 2011 U.S. Dist. LEXIS 94871 (M.D. Fla. 2011) (court determined that plaintiff's variety of management functions were sufficient to conclude that the executive exemption applied despite spending only 20 percent of time on supervisory tasks); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (manager who spent 95% of time performing nonmanagerial duties was still exempt).

[49] *Calvo v. B&R Supermarkets, Inc.*, 63 F. Supp. 3d 1369 (S.D. Fla. 2014) (primary duty of assistant store manager was management even though he regularly performed the same non-exempt tasks as hourly employees). *Garcia v. Nachon Enterprises, Inc.*, 223 F. Supp. 3d 1257 (S.D. Fla. 2016) (retail store general manager's primary duty was management even when they concurrently performed exempt and non-exempt work).

[50] *Byers v. Petro Servs.*, 110 F. Supp. 3d 1277 (S.D. Fla. 2015)(store manager alleged he spent the majority of his time performing menial tasks similar to those performed by other employees yet he also exercised substantial independent discretion and control over his duties and the store's operations, which court found was acting as a manager); *Phillips v. Tacala, LLC*, 883 F. Supp. 2d 1138 (N.D. Ala. 2012)(restaurant assistant general manager spent more than half of her work hours performing nonexempt tasks such as cooking food, preparing orders, operating the cash register, and cleaning the store, but regardless, as the manager in charge, she was responsible for ensuring that the shift ran smoothly in all respects, including paperwork, customer service, safety, cleanliness, equipment functioning, work assignments, and employee discipline and the court found that the record demonstrated that plaintiff was still acting in a managerial capacity despite her nonexempt duties).

though plaintiff regularly engaged in manual tasks generally done by hourly employees, such as: expediting the checkout lines, assisting at the deli or produce counters, stocking the shelves, retrieving shopping carts from the parking lot, re-stocking display tables, making garlic bread and opening the back door to assist with trash disposal.  However, the evidence supported the finding that plaintiff concurrently performed exempt and non-exempt work.  For example, if plaintiff was assisting at the deli counter and a customer requested to see the manager, plaintiff would leave the deli counter to respond to the waiting customer.   Significantly, the court explained that "[f]undamentally, the amount or percentage of time spent by an employee on work claimed to be exempt is not dispositive." *Id.* at 1381.  **The more useful question is whether or not the employee's managerial duties constituted the primary value the employer placed on the employee**. *Id.*  Highly relevant to the case at bar, the court noted "[t]he person 'in charge' of a store is generally considered to have management as a primary duty, even if that person spends more aggregate time performing nonexempt duties and 'makes few significant decisions.'" *Id.*

Here, Plaintiffs' only evidence that they are "similarly situated" is their classification as exempt and a uniform job posting, but neither of those "similarities" are violations of law.  One could argue that all employees are "similarly situated" because they are humans and breathing. The similarity must be relevant to an alleged violation of law which, if true, would create efficiencies by litigating the case as a collective. "To show that the potential plaintiffs are similarly situated, the plaintiff must 'demonstrate that [she] and potential plaintiffs together were victims of a common policy or plan that violated the law.'" *Chalker v. Burlington Coat Factory of Fla.*, 2013 U.S. Dist. LEXIS 159628, at *4 (M.D. Fla. 2013). To conclude that an employee may establish the similarly situated requirement simply by claiming violations of the law by the same employer, would be to conclude that any time employees alleged unpaid overtime due from the same

employer, such employees would be similarly situated. *Carruthers v. Keiser Sch., Inc.*, 2010 U.S. Dist. LEXIS 133186, at *8 (M.D. Fla. Dec. 3, 2010).

Essentially, Plaintiffs' only allegation of a violation is that Banfield classified PMs as exempt and they believe it is unlawful.   Plaintiffs' conclusion that all PMs were not properly classified is not evidence of a common practice or policy that violates the law and connects the putative class members. Plaintiffs have not explained, *with evidence, why* the classification violates the law. Plaintiffs only argue they worked more than 40 hours and were not paid overtime and therefore Banfield's classification of PMs was unlawful.   This is a circular argument –e.g., plaintiffs were exempt and did not get paid overtime and because they were exempt, Banfield violated the law.   Plaintiffs need more to obtain a court authorized notice.

**C.    *Plaintiffs' Boilerplate Declarations Fail To Offer "Substantial" And "Detailed" Allegations.***

Plaintiffs' evidence does not even meet the lenient threshold at this initial stage of certification.   Plaintiffs' declarations are entirely silent regarding two critical factors (1) what tasks the PMs performed during the *other percentage of their work time* and (2) whether PMs were still responsible for supervising and directing employees and managing hospital operations *while they were performing non-exempt tasks*.   Plaintiffs' conclusory statements are unhelpful to the analysis of whether PMs are working managers, as they leave relevant questions unanswered.[51]

Plaintiffs' declarations only raise more questions.   If management was not a PM's primary duty, who was responsible for the operation of the hospital and supervisions of the associates?

---

[51] *Ramos v. Burger King*, 2011 U.S. Dist. LEXIS 115653, *4-6 (M.D. Fla. Oct. 6, 2011) (denying certification of a class of managers based upon ten affidavits that offered conclusory allegations that all managers were required to work in the same manner, regardless of location, finding such evidence "woefully short of meeting the similarly situated standard"); *Holmes v. Quest Diagnostics, Inc.*, 2012 U.S. Dist. LEXIS 192821, at *2-3 (S.D. Fla. June 14, 2012) (finding that vague allegations in plaintiff's nearly identical declarations "lack sufficient detail and do not 'successfully engage' [the defendant's declarations] indicating that the [p]laintiffs are not similarly situated").

Who prepared the weekly hospital work schedule? Who managed the budget? Who conducted candidate screening and interviews? Who provided coaching and discipline to hospital associates? Who prepared performance evaluations? Who managed inventory? Who trained associates? Did Plaintiffs have the authority to delegate the non-exempt duties? Plaintiffs' declarations fail to address these critical factors whereas Banfield's declarations are detail rich. As such, Plaintiffs are not able to provide substance-filled declarations "**which successfully engage defendants' affidavits to the contrary**." *Goodrich v. Covelli Family Ltd. P'ship*, 2012 U.S. Dist. LEXIS 44518, at *6 (M.D. Fla. Mar. 30, 2012) (emphasis added).

Further, the failure to describe the actual day-to-day job duties of the PMs dooms Plaintiffs' Motion. It is clear from the template-like declarations that the PMs have no personal knowledge of how other PMs spent their time. Plaintiffs claim they know all PMs performed the same primary duties because of weekly conference calls with other PMs.[52] Yet, these statements are merely hearsay as each hospital only has one PM and these PMs were not in a position to observe other PMs perform their duties. Simply relying on conclusory "beliefs" and "conversations" that provide no meaningful details misses the mark. *Palacios v. Boehringer Ingelheim Pharm., Inc.*, 2011 U.S. Dist. LEXIS 92002, at *17 (S.D. Fla. 2011). In reality, only FDs can speak to the job duties of multiple PMs as they directly observed several PMs on a regular basis. The declarations of numerous FDs indicate that if, in fact, a PM was solely performing the jobs that Plaintiffs allege, that they were not meeting Banfield's expectations for the role.[53] Plaintiffs' declarations are devoid of detail on significant aspects of a PM's role that would assist the Court in determining whether a collective action is proper. Thus, Plaintiffs cannot rely on their own

---

[52] Belich ¶11; Metzler ¶11; Taye ¶12. [DE # 54, 5-18].
[53] Punales ¶12; Cobb ¶20; Floss ¶8.

limited experiences to prove that they are similarly situated to an entire collective of PMs working across the country.

### III.     Plaintiffs' Proposed Notice Request Is Improper

#### A.       *The Content of Plaintiffs' Proposed Notice is Insufficient.*

If the Court grants conditional certification despite Plaintiffs' failure to meet their burden, the content of Plaintiffs' proposed notice departs from those routinely approved by Florida districts courts. The notice is insufficient as it fails to set forth critical information fully advising the putative members "(1) that if they opt in, they may be required to appear for trial and (2) if Plaintiffs are unsuccessful, [defendant] may attempt to recover its costs from the potential class members." *Ciani v. Talk of the Town Rests., Inc.*, 2015 U.S. Dist. LEXIS 5580, *13 (M.D. Fla. 2015).

#### B.       *Dissemination of Notice Should be Limited.*

Plaintiffs request that the Court authorize multiple notices including mail, email, text message, a website, and reminders. Plaintiffs have not established why notice by mail will not be sufficient. Plaintiffs only speculate that putative collective members receive too much junk mail. Providing e-mail addresses for all putative collective action members is unwarranted due to not only privacy concerns, but also because electronic notice can be altered, forwarded to other people, or otherwise abused. *Gordon v. Kaleida Health*, 2009 U.S. Dist. LEXIS 95729, at *36 (W.D.N.Y. 2009). Second, there is "no basis yet to find that the traditional method of notice will not reach the prospective class members." *Miller v. JAH, LLC*, 2018 U.S. Dist. LEXIS 2139, at *7-8 (N.D. Ala. 2018)(agreeing to consider email communication as an alternative only "[f]or those prospective class members whose notice the Post Office returns").

Likewise, several Eleventh Circuit district courts have recently held that "sending notice via text message is unnecessary and potentially costly for the recipients."[54] Instead, this Court should use the same procedure it employed in *Ciani*, and reconsider an "email 'follow-up' notice if Plaintiffs show that [Banfield] has failed to timely and adequately provide" the proper contact information described above. 2015 U.S. Dist. LEXIS 5580, at *15.

Lastly, reminder notices are not necessary and instead are simply redundant. *Palma v. Metropcs Wireless, Inc.*, 2014 U.S. Dist. LEXIS 7787, at *8 (M.D. Fla. 2014).  Also, a reminder "potentially could be interpreted as encouragement by the Court to join the lawsuit." *Rojas v. Garda CL Southeast, Inc.*, 2013 U.S. Dist. LEXIS 179595, at *34-35 (S.D. Fla. Dec. 23, 2013).[55]  It is the responsibility of the putative member to act as they see fit once they receive that information. *Id.* In order to address these various concerns, Defendants believe it is appropriate for notice to be sent only by mail.

## CONCLUSION

Plaintiffs fall short of meeting *their burden* to prove that they and potential opt-in plaintiffs are similarly situated such that collective adjudication of their claims is efficient and appropriate. Defendants respectfully request that this Court deny Plaintiffs' Motion for Conditional Certification.  Should the Court grant Plaintiffs' Motion, Defendants ask that the Court alter the form and limit the method of any notice to putative members in a manner that addresses the privacy, cost, and objectivity concerns.

---

[54] *Gibbs*, 2019 U.S. Dist. LEXIS 107480, at *34-35; *see also Miller v. JAH, LLC*, 2018 U.S. Dist. LEXIS 2139, 2018 WL 305819, at *3 (N.D. Ala. Jan. 5, 2018).
[55] *Robinson v. Ryla Teleservices, Inc.*, 2011 U.S. Dist. LEXIS 147027, at *21 (S.D. Ala. 2011)(a reminder "would be at odds with the purpose for judicial notice-which is simply to inform potential class members of their rights.")

DATED this 11th day of February, 2020.

Respectfully submitted,

JACKSON LEWIS P.C.
390 North Orange Avenue, Suite 1285
Orlando, Florida 32802-3389
Telephone:      (407) 246-8440
Facsimile:      (407) 246-8441

By:      */s/ Stephanie L. Adler-Paindiris*
Stephanie L. Adler-Paindiris
Florida Bar No. 0523283
stephanie.adler-paindiris@jacksonlewis.com

Amanda A. Simpson
Florida Bar No. 0072817
amanda.simpson@jacksonlewis.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of February, 2020, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: Gregg I. Shavitz, Esquire, Camar R. Jones, Esquire, Alan Quiles, Esquire, Shavitz Law Group, P.A., 951 Yamato Road, Suite 285, Boca Raton, FL 33431; Steven G. Schwartz, Esquire, Schwartz Law Group, 6751 N. Federal Highway, #400, Boca Raton, FL 33487 and to Harry R. Harmon, Esquire, Kimberly J. Overbaugh, Esquire, Thomas R. Davies, Esquire, Harmon & Davies, P.C., 2306 Columbia Avenue, Lancaster, PA 17603.

*/s/ Halle Gotfredson*
Halle Gotfredson
For Jackson Lewis, PC