**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

```
-------------------------------------------------------------X
MEREDITH METZLER, DIANA BELICH,              :
BLEAN TAYE, and STEVEN BRUNO,                :
Individually and On Behalf of All Others     :
Similarly Situated,                          :   Case No. 8:19-cv-02289-VMC-CPT
                                             :
               Plaintiffs,                   :
                                             :
        -against-                            :
                                             :
MEDICAL MANAGEMENT                           :
INTERNATIONAL, INC., A CARING DOCTOR         :
(MINNESOTA), P.A., A CARING DOCTOR           :
(TEXAS), P.C., A CARING DOCTOR (NEW          :
JERSEY), P.C., XYZ CORPORATIONS 1-45, all    :
collectively d/b/a BANFIELD PET HOSPITAL     :
                                             :
               Defendants.                   :
-------------------------------------------------------------X
```

**JOINT MOTION FOR APPROVAL OF SETTLEMENT**

Plaintiffs, MEREDITH METZLER, BLEAN TAYE, DIANA BELICH, and STEVEN

BRUNO (the "Named Plaintiffs"), and Defendants, MEDICAL MANAGEMENT

INTERNATIONAL, INC., A CARING DOCTOR  (MINNESOTA), P.A., A CARING

DOCTOR (TEXAS), P.C., and A CARING DOCTOR (NEW JERSEY), P.C. (collectively

referred to herein as "Defendants" or "Banfield") file this Joint Motion for Approval of Settlement

and request that the Court approve the parties' Joint Stipulation of Settlement and Release (the

"Agreement") and dismiss this action with prejudice. In support of their Motion, the parties state

as follows:

**INTRODUCTION**

This is **not** your garden-variety misclassification case for overtime wages brought pursuant

to the Fair Labor Standards Act, 29 U.S.C. §201, *et seq*. ("FLSA").  Unlike most misclassification

cases, the Practice Managers ("PMs") who comprise the settlement class allegedly were the highest

level managerial employees at Banfield's locations, tantamount to store managers. This is in contrast to the myriad of misclassification cases involving *assistant* managers who, unlike PMs, were not allegedly "in charge" of the retail location. Thus, the instant case presented challenges not found in most misclassification cases.

However, those challenges were not insurmountable. After careful investigation, including a pre-suit information exchange and 18 months of pre-suit settlement discussions, Plaintiffs filed suit. The litigation was robust, lasting over a year, and included, two (2) mediation conferences, contested motion practice as to conditional certification, formal discovery, and exhaustive settlement negotiations.

After this pre- and post-filing contentious process which spanned over (2) years, the parties have reached a settlement. For the reasons explained in detail below, the Parties request this Court enter an Order approving: (i) the settlement set forth in the Agreement attached hereto as **Exhibit 1**; (ii) the Parties' proposed Notice and Claim Form attached to the Agreement as **Exhibits B** and **C**, respectively; (iii) the enhancement awards to the Named Plaintiffs and the Pre-Notice Opt-In Plaintiffs; and (iv) Plaintiffs' Counsel's request for reasonable attorneys' fees and reimbursement of costs and expenses.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Pre-Suit Efforts.

In March 2018, Shavitz Law Group, P.A. ("SLG") contacted Banfield inviting it to participate in class-wide settlement discussion of the PMs' FLSA claims for unpaid overtime. The parties subsequently agreed to explore pre-suit mediation. In order to maintain the status quo and to be conducive to productive negotiations, the parties entered into a tolling agreement (effective April 6, 2018) which tolled the statute of limitations for wage and hour claims for PMs employed by Banfield anywhere in the United States between April 6, 2015, and November 19, 2016

2

("the Relevant Period"), when Banfield reclassified the PM position from exempt to non-exempt.  To facilitate the pre-suit settlement discussions, Banfield provided detailed time records reflecting the times that SLG's clients punched in and out each day, in addition to excel spreadsheets reflecting the number of PMs employed, the number of weeks they were employed within the liability period, their average compensation and the states in which they were employed.  SLG used this data to create a damage model for all of the PMs to facilitate pre-suit settlement discussions.

The parties attended a pre-suit mediation on October 23, 2018, with mediator, Lisa Klerman, Esq., in California.  Despite mediating for a full day, the parties were unable to settle at that time.  Counsel for the parties continued settlement discussions after mediation, including multiple phone calls and e-mail exchanges, and a subsequent full day in-person meeting amongst counsel for the parties in Boca Raton, Florida on January 16, 2019.  The parties continued the discussions after January 16, 2019.  Despite these tremendous pre-suit efforts,  the parties were still unable to resolve the PMs' claims.  As a result, the parties cancelled the Tolling Agreement after which Plaintiff filed the instant lawsuit.

**B.    Overview of Litigation and Settlement Negotiations.**

On September 13, 2019, Named Plaintiffs filed their Complaint against Defendant, MEDICAL MANAGEMENT INTERNATIONAL, INC., d/b/a BANFIELD PET HOSPITAL. Dkt. # 1.  Thereafter, Plaintiffs' Counsel filed an Amended Complaint in which Plaintiffs named A CARING DOCTOR (MINNESOTA), P.A., A CARING DOCTOR (TEXAS), P.C., and A CARING DOCTOR (NEW JERSEY), P.C. as Defendants because those entities also owned and/or operated Banfield Pet Hospital facilities.

In their Amended Complaint, Named Plaintiffs alleged that during their employment as salaried, exempt-classified PMs, they regularly worked overtime, but were not compensated for

3

overtime hours because Defendants classified them and other PMs as exempt from overtime until November 19, 2016, when Defendants reclassified the position to an non-exempt position. Named Plaintiffs further alleged unpaid overtime while in a training program upon their hire as PMs. Defendants denied Plaintiffs' allegations, and contended that at all times, Plaintiffs were properly classified as exempt from overtime pursuant to the FLSA's executive and administrative exemptions. (Dkt. # 55 at p.28). It further asserted that although Banfield reclassified the position, it only did so after anticipated changes to the salary level of the executive and administrative exemptions were announced by the Obama administration. Although the changes to the salary level were stayed by a court order, Banfield had already announced the changes and therefore proceeded with them expecting the salary levels to eventually be enforced. Defendants continue to contend that Practice Managers are and should be exempt positions under the executive and administrative exemptions.

After the Named Plaintiffs filed this action, 10 additional PMs joined this action: Kim Hughes, Ashley Schaeffer, Shari Pleiss, Melvin Joseph Plaskey, Sadie Edwards-Nelson[1], Kiel Schmidt, Bradley Ripple, Avia Vatovac, Christina Mooney, and Miranda Lowe (collectively referred to herein as "Pre-Notice Opt-In Plaintiffs"). (Dkt. # 6).

The Court entered an FLSA Scheduling Order, in which it required the parties to exchange all documents, including timesheets and payroll records, pertaining to the unpaid wages being sought in the case (Dkt. # 18). The Order also required Defendants serve a verified summary of the hours the Plaintiffs worked, and Plaintiffs to complete and file responses to the Court's Interrogatories. *Id*. The parties were then required to attend mediation in Tampa, Florida with mediator Mark Hanley, Esq., which they did on January 8, 2020. The parties were unable to

---

[1] Ms. Nelson withdrew her Consent to Join this action, and she is no longer an Opt-In Plaintiff in this case, and will not participate in the settlement. (Dkt. # 105).

resolve the case at the January 2020 mediation.

Plaintiffs proceeded with filing their Motion to Conditionally Certify an FLSA Collective Action and Authorize Notice to Potential Collective Members ("Motion for Notice"). (Dkt. # 54). Defendants responded to oppose the Motion for Notice (Dkt. # 63), and Plaintiff replied in support of the Motion. (Dkt. # 64). The Court granted Plaintiffs' Motion for Notice (Dkt. # 67). Consistent with the Court's Order, notice of this action was sent to over 1,200 individuals who were employed by Defendants as PMs between June 12, 2015, and November 19, 2016. In addition to the four (4) Named Plaintiffs and nine (9) remaining Pre-Notice Opt-In Plaintiffs, 198 other PMs joined this action as a result of Notice being issued (hereinafter "Post-Notice Opt-In Plaintiffs"), totaling 211 Plaintiffs in this action who worked for Banfield as exempt classified PMs in 30 different states.

After the notice period closed, the parties met and conferred to discuss the scope of representative discovery. Defendants maintained that they needed written discovery from all 211 Plaintiffs, and sought to take depositions of 30 Opt-In Plaintiffs, in addition to the Named Plaintiffs. Plaintiffs also requested to depose the Opt-In Plaintiffs' supervisors and various corporate representatives. Plaintiffs also served post-notice Requests for Production and Interrogatories pertaining to the merits of Defendants' defenses. Defendants served over 2,500 pages of documents, and parties spent a significant amount of time conferring regarding electronically stored information ("ESI") that would need to be produced.

In this post-notice stage, the litigation became even more contentious. Due to the significant time and resources being dedicated to reviewing documents, preparing for over 60 depositions, conferring regarding discovery objections, establishing an ESI protocol, and preparing for potential motions to compel which would require significant briefing, the parties re-engaged in settlement discussions. About a week prior to the first series of depositions, the parties

engaged in further settlement discussions, and ultimately agreed on the material terms of a settlement, thereby saving significant time and resources.

In reaching this settlement, the parties considered the substantial risks they both faced, and the expenses already incurred after 18 months of pre-suit negotiations, a year of litigation, and the expenses to be incurred going forward. Banfield also intended to file a Motion for Decertification and file motions for summary judgment as to the merits of Plaintiffs' claims. Banfield maintains that the individual differences regarding each PM, the duties performed by each PM, the level of discretion and independent judgment exercised by each PM, the size of the hospital, the experience of the hospital staff and many other individualized factors made litigation as a collective or class impossible and would have led to the Court decertifying the collective and denying any motion for class certification under Rule 23. Further, even if the collective members survived a decertification motion and summary judgment, Banfield maintains that Plaintiffs' primary duty involved the management of the locations at which they worked and that the Court would have granted summary judgment on Banfield's defenses. Defendants maintained that Plaintiffs would be unable to demonstrate any willful violation and that Banfield regularly obtained advice from legal counsel regarding the exempt status of PMs and reasonably relied on that advice such that Plaintiffs would be barred from any recovery and at a minimum, would not have been entitled to a third year of liability or liquidated damages. Therefore, Plaintiffs' damages would be significantly reduced.

Suffice it to say, but for the settlement, the litigation would have continued to be vigorously litigated. Again, because PMs were allegedly the highest-level managerial employee at the Banfield location where they worked, Plaintiffs believe this case presented a particularly close question on the executive and administrative exemptions. As identified above, the PMs' claims and Banfield's defenses involved multiple complex issues relating both to liability and damages. Settlement saves the parties and the Court the significant expenditure of time and resources that

continued litigation would have demanded.

## II.    PROPOSED SETTLEMENT TERMS

### A.    Total Settlement and Allocation Formula.

The parties agreed to settle for gross amount of $795,000.00 ("Gross Settlement").  The Gross Settlement is comprised of two (2) *separately negotiated* buckets.  The first bucket is comprised of: (a) $373,250.00 in alleged damages to be paid to all the Plaintiffs in this action ("Plaintiff Settlement Fund"), and $36,750.00 in enhancement awards to the Named Plaintiffs and Pre-Notice Opt-In Plaintiffs.  The second bucket is comprised of (a) $350,000.00 in attorneys' fees; and (b) $35,000.00 in costs to SLG.  Separate from the gross settlement, Defendants will pay all the costs of settlement administration after July 20, 2020, as well as the employer's share of payroll taxes on the W-2 portion of the allocation.  Therefore, these expenses *will not* be deducted from the gross settlement.

Each Plaintiff's Individual Settlement Amount from the Plaintiff Settlement Fund will be determined as follows:

> (1)    Each Plaintiff will be assigned one (1) point for each week he/she was employed as a salaried, exempt-classified PM during the three (3) years prior to the date that the Plaintiff filed a consent to join this action but only for weeks between June 20, 2015 and November 19, 2016.  All weeks within the FLSA's three (3)-year statute of limitations will be valued at 1/3 the value of all weeks within the 2-year statute of limitations. Any Plaintiff employed in California will be allocated 1.25 points for each week employed as an exempt-classified, salaried PM in California between June 20, 2014 and November 19, 2016.  Additionally, any Plaintiff employed in New York will be allocated 1 point for each week employed as an exempt-classified PM in New York between June 20, 2012 and June 19, 2015. [2]

---

[2] The additional value is being applied because a four-year statute of limitations applies to claims for unpaid wages under California law, and a six year statute of limitations applies to unpaid wages claims under New York law.  Because Plaintiffs employed in California and New York will release

    (2)    To calculate each Plaintiff's Individual Settlement Amount:

        (a)    Add the value of all points for the Plaintiffs together to obtain the "Total Denominator;"

        (b)    Divide the number of points for each Plaintiffs by the Total Denominator to obtain each Plaintiff's "Portion of the Plaintiff Settlement Fund."

        (c)    Multiply each Plaintiff's Portion of the Plaintiff Settlement Fund by the Plaintiff Settlement Fund to determine each Plaintiff's Individual Settlement Amount.

50% of the payment to each Participating Members will be treated as back wages and 50% of such payment will be treated as interest, any applicable penalties, liquidated damages and other non-wage relief. The 50% portion of the Plaintiff's settlement check that is treated as wages will be made net of all applicable employment taxes, including, without limitation, federal, state, and local income tax withholding and the employee share of the FICA tax. This portion of the settlement check will be reported under the Plaintiff's social security number on an IRS Form W-2. The remaining 50% liquidated damages portion of the Plaintiff's settlement check shall be made without withholdings and shall be reported as earned in the year of payment to the IRS. This portion of the Settlement Check will be reported under the Participating Members' name and social security number on an IRS Form 1099.

    **B.    Enhancement Award Checks.**

    In addition to the overtime Settlement Checks detailed above, to acknowledge their service to the Plaintiffs, the Named Plaintiffs and the Pre-Notice Opt-In Plaintiffs are eligible for enhancement awards totaling $36,750.00. The proposed enhancement awards are broken down as follows: (a) $5,000.00 to Named Plaintiffs Metzler, Belich and Bruno; (b) $12,750.00 to Named

---

their federal **and** state law overtime claims, additional consideration is being provided for the extended limitations periods.

Plaintiff Taye[3]; and (c) $1,000.00 to Pre-Notice Opt In Plaintiffs Hughes, Lowe, Mooney, Plaskey, Pleiss, Ripple, Schaeffer, Schmidt, and Vatovac.  To receive an enhancement award, the Named Plaintiffs and Pre-Notice Opt-In Plaintiffs must sign a general release in the form attached to the Agreement as "**Exhibit D**".

### C.    Release

Plaintiffs who return completed Claim Forms will release their claims for unpaid wages, liquidated damages, attorneys' fees, costs and expenses pursuant to the FLSA, and all other federal, state, local and common laws involving wage and hour claims, for the period each Eligible Member was employed as a salaried, exempt-classified PM from the beginning of time, through and including November 19, 2016.

### D.    Notice to the Plaintiffs and Distribution of Settlement Checks.

Within fourteen (14) days of the Court's entry of an Order approving the Agreement, Defendants will provide to the Settlement Administrator and Plaintiffs' Counsel with a list, in electronic form, containing the names, last known addresses, social security numbers, state(s) worked, and applicable workweeks worked by each Plaintiff.

Within 45 days of the Court's entry of an Order approving the Agreement, the Settlement Administrator will mail Settlement Packets to each Plaintiff containing the Notice and Claim Form.  The proposed Notice informs Plaintiffs of the general terms of the settlement, the Plaintiff's Individual Settlement Amount, tax treatment of the Settlement Check, and the scope of the release. The Plaintiffs will each have to complete and return a Claim Form *via* United States Mail, e-mail, or facsimile to receive their portion of the Plaintiff Settlement Fund.  The Plaintiffs shall have sixty (60) days from the date the Settlement Packets are mailed to return their completed Claim Forms.

---

[3] Named Plaintiff Taye will receive a larger Enhancement Award than the other Named Plaintiffs because she previously declined a $12,700.00 offer from Defendants to resolve her claim in order to proceed on behalf of the FLSA Collective.

Once a Plaintiff's Claim Form is received by the Settlement Administrator, that Plaintiff's

Settlement Checks will be mailed to him/her within ten (10) business days.   Plaintiffs will have

ninety (90) days to redeem their Settlement Checks.  Any unclaimed settlement funds will revert

to Defendants within twenty (20) days of when the last settlement check becomes void.

> ### E.    Attorneys' Fees and Litigation Costs.

Subject to Court approval, the Agreement provides Plaintiffs' Counsel with $350,000.00

in attorneys' fees. The requested award of attorneys' fees and costs was separately negotiated from

the amounts being paid to Plaintiffs, and only negotiated after the parties had agreed upon an

amount for the Plaintiffs.   Plaintiffs' counsel spent over 1,000 hours prosecuting this case and

have an actual lodestar of over $500,000.00.   The chart of hours incurred per attorney is more

fully discussed below in section VII. Plaintiffs' counsel anticipates incurring an additional 40

hours or so to oversee the settlement process going forward and thus, ultimately lodestar will

exceed $520,000.00, but in settlement, the separately negotiated fees sought are $350,000.00.

Additionally, the settlement provides for Defendants to reimburse the out-of-pocket costs and

expenses of Plaintiffs' counsel in the amount of $35,000.00.   The chart of costs incurred by the

undersigned firm is laid out in section VII.

## **ARGUMENT**

## III.    THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED.

> ### A.    Standards for FLSA Settlements

The parties to an FLSA action can resolve the dispute and enter into a valid waiver of an

employee's FLSA claims where:  (i) the payment of unpaid wages by the employer to the employee

is supervised by the Secretary of Labor, or (ii) the parties present a proposed settlement to a district

court which approves the fairness of the settlement. *See Lynn's Food Stores, Inc., v. United States*,

679 F.2d 1350, 1353 (11th Cir. 1982). In discussing the approval of FLSA settlements, the Eleventh Circuit has noted:

> Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context. The employees are likely to be represented by an attorney who can protect their rights under the statute. Thus, when the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought by an employer's overreaching. If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages that are actually in dispute, we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation.

*Id.* at 1354.

"In deciding whether a settlement is fair and reasonable, the court considers the following factors: '(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the counsel.'" *Trentman v. RWL Communs., Inc.*, No. 15 Civ. 89, 2015 U.S. Dist. LEXIS 113966, at *4 (M.D. Fla. Aug. 26, 2015); *Leverso v. South Trust Bank of Ala., Nat. Assoc.*, 18 F.3d 1527, 1531 n.6 (11th Cir. 1994); *Hamilton v. Frito-Lay, Inc.*, No. 6:05-cv-592, 2007 U.S. Dist, LEXIS 10287, at *2-3 (M.D. Fla. Jan. 8, 2007). An FLSA settlement may be approved as fair even where plaintiffs receive in settlement substantially less than the amount they originally claimed. *See Rutland v. Visiting Nurse Assoc. of Central Fla., Inc*., No. 07 Civ. 1130, 2008 U.S. Dist. LEXIS 61776, at *3-4 (M.D. Fla. July 29, 2008). Discovery – including the production of records – as well as the risks associated with litigation and the viability of certain defenses, all may cause a plaintiff to settle for substantially less than the original amount claimed. *See id.* (approving FLSA settlement where Named Plaintiffs settled for approximately 6% of the wages she originally claimed); *Edwards v. CFI Sales & Mktg.*, No. 09 Civ. 234, 2011 U.S. Dist.

LEXIS 134705, at *13 (M.D. Fla. Nov. 4, 2011) (approving settlement where plaintiffs recover was well below that stated in court interrogatories). In addition, the dispute over the damages at issue in light of the defendant's affirmative defenses, liquidated damages, and the applicable statute of limitations may cause an FLSA plaintiff to accept substantially less in settlement than originally claimed. *See Ford v. Property Preservation Experts, Inc*., No. 11 Civ. 1995, 2012 U.S. Dist. LEXIS 107194, at *6-10 (M.D. Fla. July 31, 2012) (approving FLSA settlement where one opt-in plaintiff settled for less than 3% of his original claimed back wages). In short, "[t]he Court should be mindful of the strong presumption in favor of finding a settlement is fair." *Id.* at *3 (internal citations omitted).

**B.    The Parties Had a *Bona Fide* Dispute.**

In the instant case, the settlement is fair because it is a reasonable resolution of a *bona fide* dispute, reached via arms' length negotiation between adversarial parties and counsel over years of negotiations to reach resolution.

*First*, Defendants argued that the Plaintiffs' primary duties were managerial in nature, and Plaintiffs were exempt under the executive and/or administrative exemptions. While Plaintiffs argued that PMs' primary duties were non-exempt in nature despite their "manager" job title, and included such duties as customer service, scheduling and verifying pet appointments, checking patients in and out of the hospital, cleaning examination rooms between patients, and selling pet wellness plans, Defendants argued that the PMs' primary duty was managing the facilities in which they worked, including duties such as hiring, firing, interviewing, handling personnel matters and regularly exercising independent judgment and discretion on matters of significance. Plaintiffs faced the risk of a defense verdict if this matter proceeded to trial as PMs were allegedly the highest ranked employee in Defendants' facilities.

*Second*, Defendants contended that although Plaintiffs obtained conditional certification, Defendants intended to seek decertification later because the alleged differences between the duties and individualized circumstances of each Plaintiff were substantial and predominated over any alleged common issues.  If Defendants obtained decertification, then the Plaintiffs, who worked in 30 different states, would all have to bring their claims on an individual basis in different courts throughout the country, making recovery of unpaid wages challenging, risky, and costly, after having already spent hundreds of thousands of dollars litigating this action.

*Third*, this is case is somewhat unique in that Defendants actually maintained time records even during the time the PMs were classified as exempt.  These records reflected that Plaintiffs worked an average of 2 overtime hours per week.  *See* Dkt. 46 (Defendants' Verified Summary).  Therefore, Defendants contend that even if Plaintiffs worked overtime, they did not work a significant number of overtime hours.  This important discrepancy over the actual damages at issue further demonstrates that the settlement is the result of a *bona fide* dispute.

## C.  The Settlement is a Fair and Reasonable Resolution of PMs' Claims.

The Settlement satisfies all of the factors demonstrating that it is a fair and reasonable resolution of the PMs' claims.  *Trentman*, 2015 U.S. Dist. LEXIS 113966, at *4.

### i.    There Is No Fraud or Collusion Behind the Settlement.

The settlement was the result of intense adversarial arm's length negotiations that took place after detailed investigation, discovery involving the production of over 2,500 records, deposition preparation, multiple conferrals regarding discovery disputes and ESI, and significant pre-suit and litigation negotiations leading to the settlement. *See supra*. Attorneys on both sides are experienced and specialize in wage and hour cases. Accordingly, the settlement agreement was not a product of fraud or collusion.

Based upon these facts, there is no fraud or collusion, thereby demonstrating that the settlement is fair and reasonable.  *See Weldon v. Backwoods Steakhouse, Inc*., No. 14 Civ. 792014 U.S. Dist. LEXIS 123285, at *4-5 (M.D. Fla. July 15, 2014).

### ii.    Complexity, Length, and Expense of Further Litigation.

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the Parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Vassallo v. Goodman Networks, Inc.,* 2016 WL 6037847, at *2 (E.D. Tex. Oct. 14, 2016). This case is a complex, collective action that carried significant risks for the Parties as to both legal and factual issues. The Parties agreed to settle the case in order to avoid the burden, expense, and uncertainty of litigating Plaintiffs' claims on the eve of when numerous depositions were set to begin of both Plaintiffs and defense witnesses.  Defendants would have been required to incur the cost of producing and reviewing thousands of pages of ESI and other documents, preparing their witness(es) (including director level employees) for depositions and taking depositions of the discovery opt-ins.  There would potentially be over 60 depositions in this case, after which the Parties would be required to prepare for the burden and expense and uncertainties of motions to decertify the collective, Rule 23 class certification and for summary judgment. Attorneys' fees and costs were at a point that they were just about to increase at a much faster rate than before because of all the discovery in which each side was prepared to engage.

There is also no question that litigating the case to trial would require substantial time and expenses in addition to that already expended.  A trial to be conducted relating to the claims of this many Plaintiffs and the defenses raised by Defendants with respect to the collective poses its own set of complexities, ranging from various legal and factual issues and proof issues, but also to coordinating testifying Plaintiffs from states across the country. Post-trial litigation, including appeals, would be a near certainty. It is safe to assume that trial preparation, trial and post-trial

litigation would consume another year or more of effort and expense before there would be finality in this already year-old litigation. (Dkt. No. 1). Thus, additional litigation undoubtedly would increase the expenses and complexity of this litigation.

Based upon these facts, the complexity, length and expense of litigation demonstrate that the settlement is fair and reasonable. *Prada v. DCS Enters.*, 16 Civ. 850, 2017 U.S. Dist. LEXIS 124068, at *6-7 (M.D. Fla. Aug. 7, 2017)

### iii.    The Stage of the Proceeding and Amount of Discovery Completed.

This factor "evaluate[s] whether 'the Parties and the district court possess ample information with which to evaluate the merits of the competing positions.'" *Vassallo.,* 2016 WL 6037847, at *2. This case was resolved after a year of litigation, after 18 months of pre-suit settlement discussions, after three in-person settlement conferences, and after exchange of over 2,500 pages of discovery documents.   The information and discovery exchanged to date provided the parties ample information to fully and fairly evaluate the merits of their respective positions, and this factor favors approval of the settlement.

Based upon these facts, this factor demonstrates that the settlement is fair and reasonable.

### iv.    The Probability of Plaintiffs' Success on the Merits.

Plaintiffs remain steadfast about the validity and merits of their claims. However, they acknowledge that substantial risks remain regarding whether they ultimately would have prevailed on those claims. There is a risk that Defendants could succeed on its anticipated motion for decertification, which Defendants indicated its intention of filing at the close of second phase discovery. The Plaintiffs worked as PMs at various locations in 30 different states. Banfield asserts that its facilities vary by size, sales volume, layout, clientele, and staff, which directly impact the Plaintiffs' job duties and could result in decertification.

Even if Plaintiffs survived decertification, the risk of on adverse ruling on summary judgment or at trial on the merits of the claims is a real one. Banfield also asserts that the Plaintiffs each exercised independent judgment in managing their facilities, driving their location's business, hiring, training, and coaching staff, and analyzing the business needs to make effective decisions to manage the location. Defendants further contend that they have witnesses, company policies, and documents, that all support the exempt classification of PMs. Defendants also produced strong evidence that it reasonably relied on legal advice that the PMs were exempt and therefore Plaintiffs risked receiving no recovery or at least being limited to two years' recovery and no liquidated damages.

While the Plaintiffs maintain their primary duties did not involve significant judgment and discretion, Plaintiffs recognize the uncertainty of misclassification cases in litigation, especially as they were the highest ranked employee in each facility. Nonetheless, Plaintiffs would have further argued that Defendants' reclassification of the PM position to non-exempt in November 2016 is evidence of Defendants' knowledge that the position was misclassified. However, Defendants contend that the documents they produced reflecting that the legal advice it received in reclassifying the PMs to non-exempt was in connection with the Obama administration's announcement to significantly increase the salary basis for the executive and administrative exemptions, and therefore such evidence could counter Plaintiffs' arguments. With these disputes, Plaintiffs still run the risk that the judge or jury could find in favor of Defendants. This settlement has eliminated the risk of that adverse outcome.

Based upon these facts, this factor demonstrates that the settlement is fair and reasonable.

     **v.    The Range of Recovery.**

The Plaintiffs' Settlement Fund of $373,250.00 is favorable and provides the Plaintiffs significant consideration for their alleged claims. The settlement brings the Plaintiffs significant

monetary value, now, not years from now, and provides certainty about the outcome. Here, the parties also disagreed with whether a three-year or two-year statute of limitations applies, the application of the fluctuating workweek method of calculation, as well as whether liquidated damages would be recoverable by the Plaintiffs.  Banfield maintained that, even if Plaintiffs prevailed, Plaintiffs could not meet their burden to demonstrate that Banfield's conduct was willful thereby triggering a third year of liability under the FLSA.  Nonetheless, for settlement purposes only, Plaintiffs were able to secure consideration for the third year of the statute of limitations. Therefore, each Plaintiff, even those with weeks worked only in the third year of the statute of limitations, will recover money and liquidated damages under the Settlement Agreement. Each Plaintiff will receive compensation for approximately 3 hours of overtime for each week they worked as a PM during the period applicable to this settlement, ***in addition to*** an equal amount as liquidated damages.  This was determined using 80% of the work weeks at issue to account for paid time off and holidays during which PMs normally did not work over 40 hours per week. Defendants' Verified Summary (Dkt # 46) indicates that per the time records, Plaintiffs worked an average of 2 hours per week.  Therefore, Plaintiffs are being fully compensated for the overtime hours they worked under this settlement.

The average amount payable to each Plaintiff is $1,764.00.  Such amount is net of fees, costs, administration expenses and service awards, and provides a very positive outcome per practice manager for weeks worked through November 19, 2016 after which Banfield reclassified the position to non-exempt.  This compares favorably to retail assistant manager cases, which are less challenging and complex than "store manager" claims (to which the PMs are more analogous). Moreover, the average awards in many assistant manager settlements were *gross* awards, inclusive of attorneys' fees, costs, enhancement awards, and administration costs, which is not the case here. *See, e.g. Ferreira v. Modell's Sporting Goods, Inc.*, No. 11-cv-2395) (S.D.N.Y.) (final approval

obtained March 12, 2015 for $800,000 settlement for class of 689, averaging approximately $1,161 *gross* per putative class member); *Nash v. CVS Caremark Corp.,* 1:09-cv-00079 (D.RI.) (assistant store manager settlement for $34 million, the average class member claimant *gross* recovery was $1,760, a result District Judge McConnell termed "magnificent" at the final approval hearing); *Craig v. Rite Aid Corp.*, 2013 U.S. Dist. LEXIS 2658, at *41 (M.D. Pa. Jan 7, 2013) (assistant manager settlement for $20.9 million, averaging approximately $1,845 *gross* per class member); *Alli v. Boston Market Corp.*, No. 10-cv-0004 (D. Conn.) (final approval obtained April 17, 2012 for $3 million for 1,921 class members averaging approximately $1,561 *gross* per putative class member); *Jenkins v. Sports Authority*, No. 09-cv-224 (E.D.N.Y) (final approval obtained September 30, 2011 for $990,000 settlement for class of 559, averaging approximately $1,771 *gross* per class member). Therefore, those averages included attorneys' fees, costs, service awards and administration costs, which are being paid separately in the instant action and do not diminish the Plaintiffs' recovery.

Based upon these facts, this factor demonstrates that the settlement is fair and reasonable.

### vi.     The Opinions of Counsel.

The experience of the parties' respective counsel in litigating and negotiating complex wage and hour disputes likewise strongly favors approving the settlement. When reviewing settlement agreements, courts are "entitled to rely upon the judgment of experienced counsel for the Parties .... [and] absent fraud, collusion, or the like, [courts] should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977);[4] *Greco v. Ginn Dev. Co., LLC*, 635 Fed. Appx. 628, 632 (11th Cir. 2015); *Graham v. Pyramid Healthcare Sols., Inc*., No. 16 Civ. 1324, 2017 U.S. Dist. LEXIS 167062, at *3-4 (M.D. Fla. Oct. 10, 2017).

---

[4] Fifth Circuit cases decided before October 1, 1981, are binding on the Eleventh Circuit.

Counsel for the parties had an immense amount of information to evaluate, negotiate, and make well-informed judgments about the adequacy of the settlement. In counsel's opinion, the settlement is fair, reasonable, and adequate.  Also, in the view of Plaintiffs' Counsel, the settlement provides substantial benefits to the Plaintiffs, especially when one considers, among other things, the attendant expense, risks of overcoming the exemption defense for the highest position in the location (apart from the veterinarian), difficulties, delays, and uncertainties of litigation, trial, and post-trial proceedings. *Id.*

Based upon these facts, this factor demonstrates that the settlement is fair and reasonable.

## IV.    THE COURT SHOULD APPROVE THE NOTICE.

The Court should approve the proposed Notice attached to the Agreement as **Exhibit C**. The proposed Notice sufficiently informs each Plaintiff of the general terms of the Agreement, stating the amount allocated to the Plaintiff, including the settlement check to which they are entitled, tax treatment of the award, the scope of the release, and how to retain their claims and not participate in the settlement, if he/she so chooses.

## V.    THE ENHANCEMENT AWARDS TO PLAINTIFFS SHOULD BE APPROVED AS FAIR AND REASONABLE.

In recognition of their continuous service, their assistance in prosecuting the case, their participation in written discovery, their availability for multiple questions by counsel at inopportune times, their help in the ongoing investigation of their claims, their assistance in preparing Plaintiffs' Counsel for mediation, including Named Plaintiffs' attendance at mediation, the Parties have designated Enhancement Awards to the Named Plaintiff and the Pre-Notice Opt-In Plaintiffs as outlined in section II.B above.  In exchange for the enhancement awards detailed in the Agreement, the enhancement award recipients must execute a general release of all claims against Defendants.

19

Enhancement awards are intended to compensate Named Plaintiffs and the Pre-Notice Opt-In Plaintiffs for their diligence and involvement are routinely approved in FLSA collective actions by federal courts in Florida. *See, e.g.*, *Tam Su v. Electronic Arts, Inc*., 2006 U.S. Dist. LEXIS 98894, *18 (M.D. Fla. Aug. 29, 2006) (granting service award in FLSA matter); *see also Devries, et al. v. Morgan Stanley & Co. LLC, et al.*, Case No. 9:12-cv-81223, Dkt. 518 (granting service awards to thirty-five (35) plaintiffs for their assistance in obtaining settlement for the collective); *Cooper-Gutteman, et al. v. TMS Health, LLC, et al.*, Case No. 9:13-cv-81265-KAM, D.E. 38 (S.D. Fla. July 15, 2015) (granting service awards to six (6) plaintiffs for the assistance they provided in obtaining the settlement for the class even though they did not sit for deposition); *Evans v. Comcast Corp., et al.*, Case No. 9:12-cv-81203-KAM, D.E. 157 (S.D. Fla. Oct. 22, 2014) (granting service awards to five plaintiffs who sat for deposition).

## VII.    ATTORNEY'S FEES AND COSTS.

Pursuant to 29 U.S.C. § 216(b), a plaintiff who prevails on an FLSA claim is entitled to an award of reasonable attorneys' fees and expenses. In cases involving a fee-shifting statute, the Supreme Court has expressed a preference that the parties agree to the amount of the fee: "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Awards for attorneys' fees and costs in FLSA cases often exceed the amount of damages at issue for the plaintiffs, and fee awards need not be proportional to the recovery for the plaintiffs. *Riverside v. Rivera*, 477 U.S. 561, 578 (1986) ("A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts.").

Plaintiffs' counsel's fees and costs were negotiated separately from the Plaintiffs' recovery, and did not compromise the Plaintiffs' recovery.[5]  "[W]hen attorney's fees are negotiated separately from the payment to plaintiff(s), 'an in-depth analysis [of the reasonableness of the fees] is not necessary unless the unreasonableness is apparent from the face of the documents." *Gertz v. Coastal Reconstruction*, 2014 U.S. Dist. LEXIS 130302, at *5 (M.D. Fla. Sept. 10, 2014) (citing *McGinnis v. Taylor Morrison, Inc*., 2010 U.S. Dist. LEXIS 143198 (M.D. Fla. Jan. 23, 2010)); *King v. My Online Neighborhood, Inc*., 2007 U.S. Dist. LEXIS 16135 (M.D. Fla. Mar. 7, 2007); *Bonetti v. Embarq Mgmt. Co*., 715 F. Supp. 2d 1222, 1228 (M.D. Fla. 2009) (where attorney's fee was negotiated separately from, and subsequent to, plaintiff's recovery, same clearly was not affected by the amount of the attorneys' fee). Thus, there is "no need to further scrutinize amount allocated for attorneys' fees and costs [as] they were negotiated separately and apart from the compensation paid to Plaintiff.");  *Welch v. Moonlite Hospitality Servs., LLC*, 2011 U.S. Dist. LEXIS 137145, at *5, n. 2 (M.D. Fla. Nov. 28, 2011) (citations omitted).

Although in-depth scrutiny is not necessary for the separately negotiated attorneys' fee and cost award, Plaintiffs submit that the agreed-upon fee is less than Plaintiffs' Counsel's "lodestar" fees.  The lodestar is calculated by multiplying the number of hours an attorney reasonably spent on the case by an appropriate hourly rate, which is the market rate in the community for this work. There is a strong presumption that the lodestar is a reasonable amount.  *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

The total lodestar to date for the work SLG performed representing the Plaintiffs in this case is $515,929.00 for 1028.8 hours of attorney and paralegal time spent prosecuting this case. The following chart is a summary of the time and effort invested by Plaintiffs' Counsel:

---

[5] The agreement for representation between SLG and the Plaintiffs provides that SLG's attorneys' fees will be the greater of: (a) 33 1/3% of the gross settlement, or (b) SLG's lodestar.  Because SLG's lodestar exceeds 33 1/3%, the separate attorneys' fee award is being requested.

| Timekeeper | Rates | Hours | Totals |
|---|---|---|---|
| Gregg Shavitz | $600.00 | 229.7 | $137,820.00 |
| Alan L. Quiles | $550.00 | 112.0 | $61,600.00 |
| Camar R. Jones | $520.00 | 477.2 | $248,144.00 |
| Christine Duignan | $550.00 | 92.2 | $50,710.00 |
| Paralegals | $150.00 | 117.7 | $17,655.00 |
| **Totals** | | **1028.8** | **$515,929.00** |

This reflects the time actually spent, in the exercise of reasonable judgment by the lawyers and staff involved and is reflected in SLG's detailed time records. The work undertaken includes pre-suit investigation and negotiations, preparation of pleadings and motions, document review, conferral regarding discovery disputes and ESI, deposition preparation, attendance at mediation, negotiation of this settlement, and preparation of settlement and dismissal documents. The time and labor required in the prosecution of this case and negotiating this settlement was substantial considering the history of this case.

The hourly rates Plaintiffs' counsel seeks are reasonable considering SLG's expertise and familiarity and experience in FLSA collective action litigation. Detailed, reasonable, and necessary billing entries will be made available to the Court *in camera* should the Court so request. Plaintiffs' counsel's request for payment of fees in the amount of $350,000.00 represents a 33% discount from attorneys' fees incurred. Given the risks presented by this action and the results obtained, the fee requested is decidedly reasonable. There will be significant future time spent by Plaintiffs' counsel in administering the claims process and the settlement, resolving issues with the Settlement Administrator and Defendants' counsel, and speaking with Plaintiffs about the administration and the settlement.

In addition to the attorneys' fees sought above, Plaintiffs' Counsel seeks reimbursement of its out-of-pocket expenses in the amount of $35,000.00 in satisfaction of the $36,480.99 actually incurred. Like the attorneys' fee award, the amount sought is less than the costs and expenses

actually incurred and anticipated in this litigation. Plaintiffs' Counsel's actual out-of-pocket costs

and expenses are summarized in the chart below:

| Expense | Amount |
|---|---|
| Filing and Court Fees | $815.04 |
| Service of Process | $155.00 |
| Plaintiffs' portion of Mediator fees | $6,793.75 |
| Travel (including flights, ground transportation, parking and mileage) for counsel and for clients for mediation | $5,256.31 |
| Hotel accommodations for counsel and four clients for mediations | $5,463.64 |
| Postage/Courier | $123.48 |
| Notice Administration – JND Class Action Administration | $16,000.00 |
| Document Management – Everlaw | $1,873.77 |
| **Total** | **$36,480.99** |

The expenses incurred in the prosecution of this case are reflected on the books and records

of Plaintiffs' counsel. The costs described are accurate regarding all the expenses incurred; and

constitute hard, out-of-pocket monetary expenses from the beginning of the case.

Defendants do not oppose the amount of attorneys' fees and costs as set forth in the

Agreement, but rather separately agreed to it after resolving the amounts for Plaintiffs and

Enhancement Awards.

## VIII.  CONCLUSION

The Settlement is fair and reasonable, and parties respectfully request the Court approve

the Stipulation and Settlement Agreement.

Respectfully submitted this 8th day of September, 2020.

| SHAVITZ LAW GROUP, P.A.<br>951 Yamato Road, Suite 285,<br>Boca Raton, FL 33431<br>Telephone:    (561) 447-8888<br>Facsimile:    (561) 447-8831<br><br>By:    _/s/ Camar R. Jones_<br>        Gregg I. Shavitz<br>        Florida Bar No. 011398<br>        gshavitz@shavitzlaw.com<br><br>        Camar R. Jones<br>        Florida Bar No. 720291<br>        cjones@shavitzlaw.com<br><br>        Alan Quiles<br>        Florida Bar No. 062431<br>        aquiles@shavitzlaw.com<br>Attorneys for Plaintiffs | JACKSON LEWIS P.C.<br>390 North Orange Avenue, Suite 1285<br>Post Office Box 3389<br>Orlando, Florida 32802-3389<br>Telephone:    (407) 246-8440<br>Facsimile:    (407) 246-8441<br><br>By:    _/s/ Stephanie L. Adler-Paindiris_<br>        Stephanie L. Adler-Paindiris<br>        Florida Bar No. 0523283<br>        stephanie.adler-paindiris@jacksonlewis.com<br><br>        Amanda A. Simpson<br>        Florida Bar No. 0072817<br>        amanda.simpson@jacksonlewis.com<br><br>Attorneys for Defendants |

4840-0002-9898, v. 1

24